[Civ. No. 2682. Third Appellate District.—January 24, 1924.]

## J. F. PECK, Appellant, v. SIMON NEWMAN COMPANY (a Corporation), et al., Respondents.

[1] Conversion—Ownership of Hogs and Cattle—Evidence—Findings.—In this action for the conversion of certain hogs and cattle, which plaintiff claimed as lessor under the provisions of a certain lease, but which the lessee had transferred by bill of sale to defendant after the latter had levied an attachment thereon, although the evidence was conflicting, the trial court was justified in concluding that the hogs and cattle were purchased by the lessee and paid for by him and were at all times in his actual possession, and that at no time were they delivered by said lessee to plaintiff, but the latter knew the lessee claimed to be the owner of the hogs and cattle and was in the actual possession thereof, and that at no time did plaintiff assert any title thereto.

APPEAL from a judgment of the Superior Court of Stanislaus County.  Stanley Murray, Judge Presiding.  Affirmed.

The facts are stated in the opinion of the court.

C. M. Peck and Henry C. McPike for Appellant.

Goldman & Altman for Respondents.

FINCH, P. J.—Plaintiff appeals from a judgment in favor of defendants.

Plaintiff leased certain lands belonging to him to E. T. Wiggins, together with personal property thereon, including cows, bulls, heifers, calves, and hogs, for a term of seven years from January 1, 1916, the lessee to furnish the necessary labor in the operation and management of the property and the net proceeds to be divided equally between the parties.  The lease provided: "The lessee shall return to the lessor, at the end of the termination of the term, the same number of cows of the same ages of those leased, and at all times the cows upon the land which are purchased from the proceeds of the sales of the cows leased or acquired by exchange of said cows shall belong to the lessor and be a part of the property leased herewith and be held under the same terms as though the original cow had continued upon the place."  Like provisions were made as to the heifers, bulls and hogs.  It was further "agreed that, at all times, hogs, horses, mules and cattle, however acquired from funds derived, directly or indirectly, from said leased land or the produce thereof to the number of those leased shall belong to the lessor with the division herein provided for upon the termination of the lease. . . . At the termination of the term, the cows, hogs, calves, heifers and bulls shall be restored in kind and the remainder of the increase shall be divided as follows: If any of the remaining cows, calves, heifers, bulls or hogs have been purchased from the proceeds of the ranch, or the increase of those leased, these shall be equally divided between the lessor and the lessee as nearly as can be, according to their value, numbers and ages."  Further provision was made that one-half of the net proceeds "shall be paid to the lessor on the first day of each and every month."

May 25, 1918, in an action brought by defendant Simon Newman Company against Wiggins, the livestock then on the land was attached, the company paying the mortgage liens thereon hereinafter mentioned. May 29, 1918, Wiggins gave the company a bill of sale of the livestock and the company took possession of the property. A part of the property included in the bill of sale was thereafter delivered by the company to the plaintiff and this action involves only the hogs and the cattle described in the bill of sale. Plaintiff thereafter commenced this action of conversion and at the trial thereof sought to prove that he was the owner of the livestock by virtue of the terms of the lease and further that, prior to the attachment, Wiggins had transferred the property to the plaintiff, pursuant to the provisions of the lease. The only ground urged for a reversal is that the evidence is insufficient to support the findings. The evidence bearing upon some of the issues is very meager and, since plaintiff had the burden of proof, failure to produce evidence upon any issue justifies a finding in favor of defendants upon such issue.

To establish plaintiff's ownership of the livestock in controversy by virtue of the terms of the lease, it was necessary to show that the same were a part of the original stock or of the increase thereof, or had been "purchased from the proceeds of the sales" thereof, or "acquired by exchange," or acquired by the plaintiff himself by purchase or otherwise. The record is silent as to whether any of the hogs included in the bill of sale were a part of the original stock or had been acquired in such manner as to bring them within the terms of the lease. It is conceded in appellant's opening brief that "some time after entering into possession of the leased property, E. T. Wiggins disposed of all of the leased cows, heifers and calves." There is no claim that any of the cattle mentioned in the bill of sale are a part of the increase of the original stock. It remains to be ascertained whether they were purchased by plaintiff or "purchased from the proceeds of the sales" of livestock belonging to plaintiff. Relative to a part of the cattle in controversy, Wiggins testified: "I . . . found this bunch of cattle and one of the boys was with me and we decided that they were all right. I went up to Mr. J. F. Peck's office in Oakland and told him of the cattle and he said to go ahead and buy them and I asked him how about the money.

He gave me a check out of his pocketbook and told me to give a personal check for the amount. . . . When I objected, he said that it was all right, that when the check came in he would take care of it. When the cattle came, I sent them to the ranch by the boys, myself going to Oakland. I asked Mr. Peck if he had taken care of said check. He said he had forgotten it.'' A promissory note and a mortgage on the cattle purchased were then executed by Wiggins to the bank on which the check was drawn for the amount thereof. Plaintiff indorsed the note but Wiggins seems not to have known of the indorsement. In answer to a question as to whether plaintiff said anything ''as to why the chattel mortgage was to be placed in your name,'' Wiggins testified: ''Yes, sir, there was, but I don't know as I could recall the exact words. He did not care to have people down there think that he was buying cattle on time, or something to that effect.'' He testified that plaintiff never made ''any claim to any livestock on the ranch'' prior to the execution of the bill of sale to the company. Another lot of cattle was purchased by Wiggins and a promissory note, secured by a mortgage on the cattle, was given to a partner of plaintiff for the amount necessary for payment of the purchase price. The plaintiff requested his partner to make the loan. Wiggins testified that he had no conversation with plaintiff ''with reference to what was to be done with the live stock when the chattel mortgage would be paid, . . . only in a general way, that they were to be there on the place. The mortgage was given with the note and would be renewed from time to time until paid off by me''; that witness paid the sum of six hundred dollars out of his own funds for some of the cattle purchased; that nothing was said as to who was to be the owner of the mortgaged property ''when the chattel mortgages were paid''; that after the company had paid the mortgages, the plaintiff said ''that it was the money he wanted, not the stock.'' C. M. Peck, a son of the plaintiff, was plaintiff's agent during the term of the lease. He visited the ranch about twice a month and had general charge thereof. Included in the property delivered by Wiggins to the company pursuant to the bill of sale were some farming implements. Shortly after the property had been so delivered, C. M. Peck demanded the return of such farming implements but made no demand for the return of the livestock. He explained his failure to make such demand by

saying that he had not at that time seen the lease and did
not know whether the cattle belonged to plaintiff, and that
plaintiff was then in Death Valley. A demand for the
return of the livestock seems to have been made subsequently.
The testimony of plaintiff throws no light upon the trans-
actions between himself and Wiggins. If it be conceded that
the foregoing evidence would support a finding to the effect
that plaintiff was the owner of the property in question
under the terms of the lease, it cannot be held that it re-
quires such a finding.

C. M. Peck testified that prior to the levy of the attach-
ment Wiggins telephoned the witness, saying: "I am going
to give up this lease. . . . I am not going to fool with the
livestock any more"; that witness replied: "You deliver the
cattle at the place to Fred Hornback and I will get up there
in the next day or so"; that witness went to the ranch two
or three days later, before the attachment was levied, and
that Wiggins there said: "I will give up the cattle under
the terms of the lease. . . . Hornback out there has already
taken charge of them. . . . I delivered them to him in com-
pliance with our telephone conversation the other day."
The testimony of the witness is corroborated by that of
Glen Hornback and Fred Hornback. Wm. C. Wiggins testi-
fied that C. M. Peck was not at the ranch at the time stated
by the latter. E. T. Wiggins testified that he was in the
actual possession of the property up to the time of the at-
tachment; that he did not have the telephone conversation
with C. M. Peck as testified by the latter; and that he did
not tell Hornback that C. M. Peck had said to turn the
cattle over to Hornback. In weighing the evidence, the
court may have considered of some importance the failure
of C. M. Peck to demand the return of the livestock at the
time he demanded the return of the farming implements as
heretofore stated. If in fact the livestock was transferred
to plaintiff prior to the attachment and the execution of
the bill of sale, C. M. Peck had knowledge thereof, according
to his own testimony, and it would have been most natural
for him to demand the return thereof with the farming im-
plements.

[1] From the conflicting evidence, the court found that
the personal property in controversy "was actually pur-
chased by said E. T. Wiggins and paid for by him and
was at all times in his actual possession and at no time was

said property ever delivered by said Wiggins to plaintiff, but plaintiff knew that said E. T. Wiggins claimed to be the owner thereof and was in the actual possession of said property, and at no time did said plaintiff assert any title to said property.'' There is sufficient evidence to support the findings, notwithstanding the contradictory evidence.

The judgment is affirmed.

Plummer, J., and Young, J., *pro tem.,* concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 24, 1924.

All the Justices concurred.